**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KAREN CHEUNG (a/k/a WING TSZ CHEUNG),<br><br>Plaintiff,<br><br>-against-<br><br>APTORUM GROUP LIMITED, APTUS MANAGEMENT LIMITED, IAN HUEN CHUNG YUEN, JURCHEN INVESTMENT CORPORATION and MAXIMILIAN LING, a/k/a SHUI HUNG LING<br><br>Defendants. | Case No. 1:24-cv-09969-VSB-OTW |

# FIRST AMENDED COMPLAINT

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
77 Water Street, Suite 2100
New York, New York 10005
Telephone: (212) 232-1300
*Attorneys for Plaintiff Karen Cheung*

Plaintiff Karen Cheung ("Ms. Cheung" or "Plaintiff"), by and through her attorneys, brings this first amended complaint (the "Complaint") against Defendants Aptorum Group Limited ("Aptorum" or the "Company"), Aptus Management Limited ("Aptus"), Ian Huen ("Huen"), and Jurchen Investment Corporation ("Jurchen") and Maximilian Ling, a/k/a Shui-Hung Ling ("Ling" and collectively with Aptorum, Aptus Huen, and Jurchen, the "Defendants"). In further support of her first amended Complaint, Ms. Cheung respectfully allege as follows:

## NATURE OF THE CASE

1. This is a civil action to recover losses sustained by Plaintiff as a result of a brazen fraudulent scheme by the Defendants and others to violate both the federal RICO statute, 18 U.S.C. §§ 1961-68 and New York common law. The predicate federal criminal acts that triggered civil RICO liability are mail fraud, wire fraud, money laundering and identity theft.

2. Aptorum is a Chinese company organized in the Cayman Islands. Plaintiff's claims arise from Defendants' brazen scheme to purchase, in Ms. Cheung's name and without Ms. Cheung's consent or knowledge, shares of Defendant Aptorum which were traded on the NASDAQ Exchange in New York City. Defendants and their confederates accomplished their illegal goals by forging Ms. Cheung's signature on an account opening form in Hong Kong and by directing another Chinese woman to pretend to be Ms. Cheung to speak with a brokage firm in Hong Kong to clear that firm's Know Your Customer protocols. The account opening form contains a phone number and an email address falsely asserted as those of Ms. Cheung and Ms. Cheung's supposed signature was purportedly witnessed by a co-conspirator of the Defendants, Kendrick Fok. **The Hong Kong Police has identified Defendant Ling as the registered owner of that fraudulent number and has arrested Mr. Ling for possible criminal prosecution**. The phone calls in which the still unidentified woman pretended to be Ms. Cheung for KYC purposes

are recorded and it can be easily established that the female voice on those calls is not that of Ms. Cheung. In short, Plaintiff is a victim of a scheme perpetrated by the management and the majority shareholders of Defendant Aptorum and other co-conspirators (the "Enterprise").

3. The management of Defendant Aptorum, led by Defendant Huen, orchestrated this scheme which started in Hong Kong and later developed in New York. Plaintiff was fraudulently induced by Enterprise into the scheme whereby large quantities of shares in Defendant Aptorum were bought in Plaintiff's name, without her knowledge and/or consent and in fact against her express instructions to the Enterprise not to purchase Aptorum shares on her behalf.

4. Defendant Huen controls Aptorum. Huen, from a socially and politically prominent family in Hong Kong with deep connections to the Communist regime in Beijing, was the Chief Executive Officer and a Director of Aptorum during the relevant time period, and following a brief interlude between June 22, 2022 – November 27, 2023, Huen is now again Aptorum's CEO. Huen works out of Aptorum's office in Manhattan, located at 1325 Avenue of the Americas, New York, New York, from time to time. Huen is the mastermind of the Enterprise.

5. Unknown to the Plaintiff, at the direction of Mr. Huen and other members of the Enterprise and consistent with the goals of the Enterprise, the Defendants used Ms. Cheung's funds without her knowledge or permission to buy large quantities of shares in Defendant Aptorum over a short period of time (between May 7, 2019, and June 7, 2019), in order to artificially inflate the share prices of shares in Defendant Aptorum from US$19.77 to US$32.28 per share within that time period. Defendants were able to use Ms. Cheung's funds by forging her signature on a legal document needed to open an account in Hong Kong and directing another Chinese woman to pretend to be Ms. Cheung to speak with the staff of a regulated entity in Hong Kong. As a result of Defendants' illegal conduct, which constitutes wire fraud, mail fraud, money laundering and

identity theft under United States law, the Enterprise was able to create the false appearance of market activity for the shares in Defendant Aptorum, which in turn enabled the Enterprise to falsely represent Defendant Aptorum to the markets and investors in the United States as a company with real business potential and investment upside.

6. On the back of this racketeering orchestrated by the Defendants, the Enterprise successfully procured the placements of shares in New York whereby it managed to attract approximately US$15 million in investment from outside investors. The proceeds from these placements were then channeled back to the Enterprise under the ultimate control of Defendant Huen in the form of extravagant director's fees and consulting fees. The Enterprise thus was able to profit at the direct expense of the Plaintiff and presumably many other victims in the Chinese-speaking world.

7. Apart from being the majority shareholder and controller of Defendant Aptorum, Defendant Huen also owned and/or controlled the corporate entities (i.e., Aeneas, ACL and AML, as defined and discussed below) and personnel in Hong Kong who were part of the Enterprise that orchestrated and/or effectuated the fraud scheme. Upon information and belief, Huen directly controls and supervises the work of Ling, **who as noted has been arrested by the Hong Kong Police** for his role in the Enterprise to defraud Ms. Cheung.

8. Plaintiff is therefore forced to bring this litigation to seek damages (including punitive damages), costs and attorney's fees and costs under federal and state laws.

## PARTIES

9. Ms. Cheung is an individual residing in Hong Kong and holds citizenship of the United Kingdom.

10. Defendant Aptorum is an exempted company with limited liability organized under the laws of the Cayman Islands, with its principal place of business in Hong Kong, S.A.R., China, and its purported principal executive offices in London, England. Defendant Aptorum maintains a North America Office on the 27th and 28th floors of 1325 Avenue of the Americas, New York, New York 10019. It is listed on the NASDAQ Exchange. It is apparently in the process of being delisted for multiple compliance and regulatory failures.

11. Defendant Aptus is a corporation organized under the laws of Hong Kong, S.A.R., China, with its principal place of business in Hong Kong. Upon information and belief, Aptus provides management services to Defendant Aptorum and other of its subsidiaries, including but not limited to AML.

12. Defendant Huen is an individual who upon information and belief resides in Hong Kong, S.A.R., China and/or the United Kingdom. Huen is a founder of Aptorum and the mastermind of the Enterprise. He works out of the Manhattan office from time to time. Huen is a member of a prominent family in Hong Kong with direct access to the Communist leadership in Beijing.

13. Jurchen is a holding company of Aptorum. Jurchen is, upon information and belief, a limited liability company organized under the laws of the British Virgin Islands and is wholly-owned by Defendant Huen. Upon information and belief, it holds not less than 69 percent of the outstanding and issued shares of Aptorum.

14. Ling is a natural person residing in Hong Kong. He has been arrested by the Hong Kong Police for his role in the Enterprise.

**<u>OTHER MEMBERS OF THE ENTERPRISE</u>**

15. Darren Lui, upon information and belief, resides in Hong Kong, China. Mr. Lui and his family have a long-standing association with Mr. Huen. Mr. Lui was a co-founder of ACL (as defined below). Mr. Lui and his family owned about 23 percent of the ACL's shares. Through an investment vehicle called CGY Investments Limited (which Mr. Lui owns 50 percent), the Lui family controls more than 15 percent of the shares of Aptorum.

16. Mr. Lui was until June 2020 a director of AML. When the misconduct at issue in this litigation took place, Mr. Lui was Aptorum's President and Chief Business Officer. In June 2022, Mr. Lui succeeded Mr. Huen as Aptorum's Chief Executive Officer, Chief Accounting Officer and Executive Director.

17. Mandy Lui is a sister of Defendant Darren Lui. Ms. Lui is a relatively well-known person in the financial industry in Hong Kong. Ms. Lui owns 25 percent of CGY Investments Limited, the investment vehicle through which the Lui family exercises its shares in Aptorum. Ms. Lui works closely with her brother, Mr. Lui, and others regarding Aptorum matters. For example, Ms. Lui is a director of CGY Investments Limited which executed a consultancy agreement with Aptorum under which it was paid HKD$104,000 per month (approximately US$13,333 per month).

18. Mr. Kenrick Henry Fok ("Fok") is an individual residing in Hong Kong, S.A.R., China. Upon information and belief, Fok has been approved by the SFC as a "Responsible Officer" of Aeneas Capital in connection with its securities business. Fok graduated from Brown University and has upon information and belief maintained extensive ties to the United States.

19. Fok also has extensive business and personal ties to the Enterprise that cause him to be deeply enmeshed in the fraud scheme of the Enterprise along with the other co-conspirators and affiliated entities. For example:

a. Until on or about December 1, 2020, Mr. Fok was a director of Aeneas Capital. To date, Mr. Fok continues to serve as a portfolio manager there;

b. Mr. Fok is also a director of Aeneas Management

c. Until on or about May 25, 2020, Mr. Fok was a director of Aptus.

20. Aeneas Group Limited ("Aeneas Group") is a corporation organized and existing under the laws of Hong Kong, S.A.R., China. It is 76.8 percent owned by Jurchen; prior to March 29, 2019, Jurchen owned 100 percent of Aeneas. It has therefore always been under the control of Defendant Huen. For this reason, Aptorum considers Aeneas to be a fellow subsidiary of Aptorum. Upon information and belief, Aeneas is a financial services entity with a focus on the fintech and healthcare industries.

21. Aeneas Capital Limited, a/ka/a Securis Capital Limited ("ACL" or "Aeneas Capital") is a corporation organized under the laws of Hong Kong, S.A.R., China, with its principal place of business in Hong Kong. ACL is licensed by the Hong Kong Securities and Futures Commission ("SFC") to engage in investment management, securities brokerage (including dealing in and advising on securities), investment advisory, and asset management activities.

22. Until on or about November 10, 2017, ACL was wholly-owned by Jurchen, and Defendant Huen was a co-founder of Aeneas Capital. Therefore, ACL had been under the direct control of Defendant Huen.

23. Upon information and belief, Mr. Lui is a co-founder of ACL as well, and until on or about September 11, 2019, he served as a director and a Responsible Officer of ACL.

24. Since on or about November 10, 2017, ACL has been wholly-owned by Aeneas Group and thus it continues to remain under Huen's control.

25. Aeneas Management Limited ("AML") is a corporation organized under the laws of Hong Kong, S.A.R., China, with its principal place of business in Hong Kong. AML provides asset management and investment services to clients and affiliates of Aeneas Group, including to subsidiaries of Defendant Aptorum. AML is wholly-owned by Aeneas Group and is an affiliate of Aptorum. AML is also under the control of Defendant Huen. Upon information and belief, Mr. Lui was a director of AML until in or about June 2020.

**JURISDICTION AND VENUE**

26. This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over Plaintiff's common law claims pursuant to 28 U.S.C. § 1367.

27. This Court has specific personal jurisdiction over Defendants pursuant to CPLR § 302(a)(1) because they conduct business in the state of New York, including through an office in Manhattan on the Avenue of the Americas.

28. This Court has specific personal jurisdiction over Defendants pursuant to CPLR § 302(a)(2) because each of these Defendants has "commit[ed] a tortious act within the state."

29. Jurisdiction over all Defendants in this action is also proper pursuant to CPLR § 302(a)(2) because the facts set forth herein establish conspiracies among Defendants. Each Defendant was a member of the conspiracy, each Defendant had an awareness of the effects of their activity on Plaintiff in New York, and all of the Defendant conspirators committed an overt act to further the conspiracy or orchestrated the conspiracy as set forth in greater detail below. Defendants acted in concert with each other and with each other's active support and approval to accomplish their common objectives. In addition, each Defendant is an agent and/or alter ego of another Defendant.

30. This Court has specific personal jurisdiction over Defendants pursuant to CPLR § 302(a)(3) because each of these Defendants has "commit[ed] a tortious act without the state causing injury to person or property within the state." Such tortious acts include, but are not limited to, violations of civil RICO (18 U.S.C. § 1962(c)), including predicate acts of identity theft, wire fraud, mail fraud, money laundering, as well as behavior amounting to common law fraud, unjust enrichment, aiding and abetting breach of fiduciary duty and civil conspiracy. Pursuant to CPLR § 302(a)(3)(i), each of Defendants "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state" through their systematic and continuous business dealings in New York; through the substantial profits derived from these dealings. Similarly, each of Defendants do the same through their continuous business activities and substantial profits derived in New York. Furthermore, each of these Defendants "expect[ed] or should [have] reasonably expect[ed]" their tortious acts "to have consequences in the state" and "derive[d] substantial revenue from interstate or international commerce" pursuant to CPLR § 302(a)(3)(ii).

31. If any of the Defendants is not subject to general personal jurisdiction in any state in the United States, this Court would have jurisdiction over such a defendant pursuant to F.R.C.P. 4(k)(2) through Plaintiff's civil RICO claim because exercising personal jurisdiction over a defendant's efforts to commit a RICO violation would be consistent with constitutional due process.

32. Finally and in the alternative, if one defendant is subject personal jurisdiction for Ms. Cheung's federal RICO claim, then all other defendants named herein are also subject to such jurisdiction. *See PT United Can Co. Ltd. v. Crown Cork & Seal Co.*, No. 96-CV-3669, 1997 WL 31194 (S.D.N.Y. Jan. 28, 1997), *aff'd* 138 F.3d 65, 71 (2d Cir. 1998); *see* 18 U.S.C. § 1965 ("In

any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States.”).

33. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in New York County.

## TOLLING AGREEMENT

34. On or about June 17, 2024, the Defendants named herein (other than Defendant Ling whose identity was unknown to Ms. Cheung at the time) entered into a tolling agreement with Ms. Cheung tolling all applicable statutes of limitations concerning their disputes until August 31, 2024. Ms. Cheung commenced this litigation against Defendants on September 3, 2024, the first business day following the expiration of the tolling agreement, by filing a summons with notice in New York State Court. Defendants subsequently removed to this Court.

## FACTUAL ALLEGATIONS

35. In or about 2018, the Enterprise, under the leadership of Defendant Huen, began a hard sell to convince Ms. Cheung to purchase shares of Defendant Aptorum. The Enterprise and Defendant Huen assigned the day-to day-task of pressuring and ultimately bamboozling Ms. Cheung into buying shares of Aptorum to Mr. Fok Mr. Lui, Mr. Ling and others.

36. Ms. Cheung first met Defendant Huen in 2017 at a reception at the Mandarin Oriental Hotel in Hong Kong, where Defendant Huen discussed Aptorum’s business plan with Ms. Cheung. Defendant Huen hosted another event at the Four Seasons Hotel in Hong Kong in or about early 2018 attended by Ms. Cheung. In that event, Defendant Huen informed those in attendance that Defendant Aptorum had IPO ambitions in the United States.

37. Ms. Cheung was introduced to both Mr. Fok, as a portfolio manager at Aeneas Capital, and to Mr. Lui, as a Director at Defendant Aptorum toward the end of 2017. In or about February 2018, Mr. Lui told Plaintiff he was looking for investors for Aptorum. The Enterprise repeatedly tried to lure Ms. Cheung into buying Aptorum shares by offering her various deals and inducements, including special friends and family pricing, other special (and very steep) discounts or through a private placement. Plaintiff did her own due diligence and concluded that Aptorum had no upside and would not be a promising investment. Plaintiff flatly told the Enterprise on multiple occasions that she was not interested in investing in Aptorum.

38. Mr. Fok, operating on behalf of the Enterprise and Mr. Huen, refused to give up. Acting as an agent of the Mr. Huen and the Enterprise, he relentlessly pursued and pressured Ms. Cheung to invest with and open an account with Aeneas Capital even if she were to pass on buying Aptorum shares. Ms. Cheung met with Mr. Fok over lunch, on or about March 27, 2019, to discuss opening such an account as well as possible investments in certain stocks. Aptorum's stock, however, was not discussed during this March 2019 meeting. Ms. Cheung believed that by then she had made it very clear that she was not interested in Aptorum. Ms. Cheung wanted to work with Mr. Fok because they had become socially close. Ms. Cheung was also impressed with Fok's personal story: that despite coming from an ordinary Chinese family in Hong Kong, he was able to complete a degree at an Ivy League university and became a financial professional. Mr. Fok also misled Ms. Cheung into believing that Mr. Fok was not a Aptorum shareholder and he would have no direct personal interest in how well Aptorum did.

39. On or about April 23, 2019, Ms. Cheung met Mr. Fok again at a coffee shop, where Mr. Fok represented to Ms. Cheung that her client account with Aeneas Capital would be established as an omnibus custodian account maintained by Aeneas Capital at Futu Securities

International (the “Omnibus Custodial Account”), a Hong Kong brokerage firm with a U.S. affiliate, for the benefit of Aeneas Capital’s clients (“FSI(HK)”).

40. Mr. Fok then requested that Ms. Cheung issue a check for HK$8 million (approximately $1.2 million USD), payable to FSI(HK), allegedly for deposit into the Aeneas Capital Omnibus Custodial Account maintained at FSI(HK). Mr. Fok explained to Ms. Cheung that ACL had maintained an account at Futu. Ms. Cheung’s HKD 8 million would be deposited into ACL’s account with Futu maintained in Ms. Cheung’s name. Mr. Fok never told Ms. Cheung that she would be opening an account at FSI(HK) in her name, and she did not suspect otherwise.

41. Immediately after the April 23, 2019 meeting and in reliance on Mr. Fok’s representations, Ms. Cheung wrote a check in the amount of HK$8 million to deposit into the Omnibus Custodial Account. Ms. Cheung left the payee blank on the check, and Ms. Cheung then gave the check to Mr. Fok who filled in the name of the payee as FSI(HK).

42. Unbeknownst to Ms. Cheung —and contrary to the representations made by Mr. Fok to Ms. Cheung at the April 23, 2019 meeting—Mr. Fok, acting as an agent of the Enterprise, instead established a personal account at FSI(HK) in Ms. Cheung’s name, without her authority, knowledge, or consent. Mr. Fok was acting in concert and at the direction of the Enterprise.

43. Between May 7, 2019, and June 14, 2019, acting at the direction of and on behalf of Enterprise, Mr. Fok caused the purchase of shares of Aptorum on the NASDAQ with Ms. Cheung’s funds and without her knowledge, consent, or authorization, as follows:

| Date | Shares Purchased[1] | Actual Amount Paid | Avg Price for Purchases | Total Volume[2] | Percentage of Volume |
|---|---|---|---|---|---|
| 5/7/2019 | 6,361.00 | $120,750.76 | 18.99 | 21,910.00 | 29.03% |
| 5/8/2019 | 2.00 | $41.82 | 20.91 | 11,180.00 | 0.02% |
| 5/9/2019 | 400.00 | $8,238.00 | 20.60 | 6,090.00 | 6.57% |
| 5/10/2019 | 1,555.00 | $33,152.68 | 21.28 | 4,530.00 | 34.33% |
| 5/13/2019 | 2,677.00 | $54,837.80 | 20.49 | 9,420.00 | 28.42% |
| 5/14/2019 | 355.00 | $7,452.40 | 20.97 | 7,420.00 | 4.78% |
| 5/20/2019 | 2,200.00 | $53,135.03 | 24.21 | 9,510.00 | 23.13% |
| 5/21/2019 | 498.00 | $12,110.40 | 24.20 | 7,630.00 | 6.53% |
| 5/22/2019 | 299.00 | $7,367.36 | 24.64 | 7,960.00 | 3.76% |
| 5/23/2019 | 2,000.00 | $51,200.00 | 25.60 | 8,390.00 | 23.84% |
| 5/28/2019 | 682.00 | $19,812.10 | 29.05 | 14,840.00 | 4.60% |
| 5/29/2019 | 4,749.00 | $138,587.21 | 29.20 | 13,000.00 | 36.53% |
| 5/30/2019 | 1,500.00 | $43,785.00 | 29.19 | 5,000.00 | 30.00% |
| 5/31/2019 | 355.00 | $10,614.50 | 29.90 | 17,390.00 | 2.04% |
| 6/3/2019 | 100.00 | $3,282.00 | 32.82 | 19,630.00 | 0.51% |
| 6/4/2019 | 705.00 | $23,131.55 | 32.68 | 11,510.00 | 6.13% |
| 6/5/2019 | 106.00 | $3,448.09 | 32.47 | 5,590.00 | 1.90% |
| 6/6/2019 | 1,470.00 | $47,934.38 | 32.59 | 7,880.00 | 18.65% |
| 6/7/2019 | 1,003.00 | $32,074.14 | 31.91 | 4,170.00 | 24.05% |
| 6/10/2019 | 160.00 | $4,760.00 | 30.06 | 7,150.00 | 2.24% |
| 6/11/2019 | 102.00 | $3,057.48 | 29.82 | 5,730.00 | 1.78% |
| 6/12/2019 | 452.00 | $12,656.04 | 28.35 | 8,110.00 | 5.57% |
| 6/13/2019 | 100.00 | $2,080.00 | 20.80 | 11,670.00 | 0.86% |
| 6/14/2019 | 1.00 | $22.30 | 22.30 | 13,930.00 | 0.01% |

44. All of the purchases of the Aptorum Shares between May 7, 2019, and June 14, 2019, were made on the NASDAQ and cleared through a U.S. affiliate of FSI(HK) known as Futu

[1] As of January 23, 2023 shares of Aptorum are trading on a 1-for-10 reverse stock split-adjusted basis. All tables in this Affirmation are based on the trading data that existed as of the time period relevant to this lawsuit. The historical data available through NASDAQ applies the split-adjusted basis to its historical data and therefore requires the viewer to adjust the "Avg Purchase Price" and "Total Volume" of the relevant time period by the corresponding single decimal place change affected by the 1-for-10 reverse stock split. *See* Press Release of Aptorum re: the stock split, available here: https://ir.aptorumgroup.com/news-releases/news-release-details/aptorum-group-announces-1-10-reverse-stock-split .

[2] *See* https://www.nasdaq.com/market-activity/stocks/apm/historical (source for historical data on "Total Volume").

Clearing Inc. ("FCI"). FCI is a corporation organized under Delaware law, with its principal place of business in Dallas, Texas.

45. The rapid-fire purchase of Aptorum shares by Mr. Fok, acting on behalf of the Enterprise, caused the price of Aptorum stock to nearly double: from $18.99 per share to $32.68 per share in just four weeks time. This had a number of positive financial and economic benefits for the Enterprise and others.

46. On or about June 12, 2019, as part of the Defendants' effort to legitimize this unauthorized trading in Aptorum shares in Ms. Cheung's account after the fact, Mr. Fok caused ACL to provide to Ms. Cheung the procedure to place orders for Aptorum by e-mail.

47. Ms. Cheung had never issued any orders for the purchase of Aptorum Shares to ACL (and in fact had made it clear to the Enterprise that she was not interested in Aptorum), nor did Ms. Cheung subsequently provide any orders for the purchase of Aptorum Shares. Accordingly, Ms. Cheung immediately contacted Mr. Fok via WhatsApp to ask about her account status at ACL.

48. Between June 14, 2019, and June 23, 2019—and for the first time—Mr. Fok informed Ms. Cheung via WhatsApp that he had directed that Ms. Cheung's funds be applied to purchase Aptorum shares, in direct violations of her instructions. At this time Mr. Fok did not provide details as to how much of Ms. Cheung's funds he had used, or how many shares he had purchased in Ms. Cheung's account.

49. On June 23, 2019, Ms. Cheung asked Mr. Fok for account statements. Ms. Cheung thereafter contacted Mr. Fok via WhatsApp to determine her account status. Mr. Fok responded via WhatsApp that ACL had prepared monthly statements and that he would send one to Ms. Cheung soon.

50. On or about June 24, 2019, Ms. Cheung again communicated with Mr. Fok via WhatsApp and demanded to see her account statements for April and May 2019. Mr. Fok replied the same day to Ms. Cheung via WhatsApp that statements were being prepared, including one through June 2019, and would be delivered to Ms. Cheung soon.

51. Ms. Cheung replied the same day by WhatsApp instructing Mr. Fok to begin selling her Aptorum shares immediately.

52. On or about June 27, 2019, Ms. Cheung finally received an account statement for May 2019, which purported to be for Ms. Cheung's account with ACL.

53. Also on or about June 27, 2019, after Ms. Cheung received the May 2019 account statement, Ms. Cheung contacted Mr. Lui via text message to ask when she would be able to sell her shares of Aptorum. Mr. Lui suggested in response that Ms. Cheung hold her Aptorum shares for several more months.

54. On or about June 28, 2019, Mr. Fok advised Ms. Cheung via WhatsApp that she would soon be receiving the account statement for June 2019. Several days later, on or about July 4, 2019, Ms. Cheung received a June 2019 account statement, which purported to be for her account with ACL. For the first time, Ms. Cheung learned that the Enterprise had caused the purchase of 27,832 Aptorum shares with her funds.

55. On or about July 14, 2019, Ms. Cheung asked Mr. Fok via WhatsApp whether he had successfully sold the Aptorum shares in Ms. Cheung's account. Mr. Fok responded via WhatsApp with an ambiguous answer. Ms. Cheung then had a call with Mr. Fok two days later, on or about July 16, 2019, at which time Ms. Cheung again instructed Mr. Fok to sell all of the Aptorum shares purchased into her account, and to fully refund her deposit of HK$8 million.

**The Enterprise Ignores Ms. Chueng's Instructions and Continue**
**Purchasing Aptorum Shares Without Her Knowledge or Authorization**

56. Rather than following the clear instructions Ms. Cheung gave between June 24, 2019, and July 16, 2019 (detailed above) to sell the Aptorum shares and refund her deposit as he was required to do, Mr. Fok—as an integral part of Enterprise's plan to inflate and maintain the price of Aptorum shares—acting at the direction and on behalf of the Enterprise, continued to execute his plan and **purchased an additional 2,245 Aptorum Shares** on the NASDAQ using Ms. Cheung's funds, again, without her knowledge, authorization or consent and against her express instructions not to do so:

| **Date** | **Shares Purchased** | **Actual Amount Paid** | **Avg Price for Purchases** | **Total Volume** | **Percentage of Volume** |
|---|---|---|---|---|---|
| 7/10/2019 | 450.00 | $10,295.33 | 22.88 | 4,300.00 | 10.47% |
| 7/19/2019 | 161.00 | $3,559.92 | 22.02 | 2,040.00 | 7.89% |
| 7/22/2019 | 470.00 | $10,428.48 | 22.14 | 4,380.00 | 10.73% |
| 7/23/2019 | 306.00 | $6,671.50 | 21.77 | 2,050.00 | 14.93% |
| 7/25/2019 | 120.00 | $2,654.40 | 22.12 | 980.00 | 12.24% |
| 8/13/2019 | 75.00 | $1,185.00 | 15.80 | 4,050.00 | 1.85% |
| 8/21/2019 | 163.00 | $2,575.40 | 15.80 | 730.00 | 22.33% |
| 9/6/2019 | 500.00 | $7,900.00 | 15.80 | 20,280.00 | 2.47% |

57. Upon information and belief, all of the purchases of the Aptorum Shares between July 10, 2019, and September 6, 2019, made on the NASDAQ were cleared through FCI. Not one of them had been authorized by Ms. Cheung, and Ms. Cheung remained unaware of them.

58. Following Ms. Cheung's repeated requests to liquidate her account with ACL, the Enterprise (rather than complying with Ms. Cheung's instructions) proposed to enter into a purported settlement arrangement with me. The proposed terms were as follows:

> Ms. Cheung would continue on with the client agreement with ACL and in exchange, Mr. Fok and ACL would:
>
> a. cause Ms. Cheung's uninvested cash balance of approximately HK$2 million (approximately U.S. $255,242) to be returned to Ms. Cheung;

b. ACL would loan Ms. Cheung HK$2 million at the annual interest rate of 1 percent, which supposedly would substantially or completely cover the difference between the then-prevailing market price of her Aptorum shares and the exercise price of a put option in Aptorum shares to be granted to Ms. Cheung;

c. the Loan would only become repayable when the share price of Aptorum shares reached US $24.56, so that Ms. Cheung would be able to liquidate the 30,077 Aptorum shares held at ACL at an average price of US $24.56, and thus recover at a minimum her initial investment of approximately HK$5.788 million (US $738,69l.12);

d. As additional consideration, Mr. Fok would arrange for a put option to be granted to Ms. Cheung, which would provide Ms. Cheung the option to sell the 30,077 Aptorum Shares at US $16.09 per share (the equivalent of approximately HK $3.792 million or US $483,938.93) in total ("the Put Option").

e. ACL and Mr. Fok would pass authority and control over the account held at FSI (HK) to Ms. Cheung (together, the "Settlement").

59. The Settlement supposedly would allow Ms. Cheung to recover her investment of HK$8 million fully, including by covering the mark-to-market loss on the Aptorum Shares (approximately HK$2 million (or approximately US$255,242.03) in September 2019).

60. In reliance on these representations and promises from the Enterprise, Ms. Cheung entered into a number of agreements embodying the terms of the Settlement Agreement with, among others, members of the Enterprise.

61. On or about January 6, 2020, Aptorum filed a Form F-3 Registration Statement and Prospectus with the SEC concerning a proposed February 2020 Direct Offering.

62. The closing price for Aptorum on the NASDAQ on February 25, 2020, was US $14.40 per share. The February 2020 Direct Offering closed on or about February 28, 2020, at a

combined purchase price for the shares and warrants to purchase shares of US $7.40.[3] Accordingly, the February 2020 Stock Offering was heavily discounted, at almost half the market price at the time, and as a direct result the price per share of Aptorum shares dropped steeply, directly causing Ms. Cheung to suffer further damages.

63. On or about February 27, 2020, Ms. Cheung approached Mr. Fok about exercising the Put Option of the Settlement early and getting her money back. Mr. Fok told Ms. Cheung that Aptorum had announced a direct offering the day before that had made many people unhappy, and informed Ms. Cheung in any event she would not be able to exercise the Put Option for two years.

64. On or about June 7, 2020, Ms. Cheung e-mailed Mr. Fok to stress her disappointment that Enterprise had invested Ms. Cheung's funds without her consent, into the stock of a single, illiquid company at a very high price, *i.e.*, Aptorum. Ms. Cheung further informed Mr. Fok of her growing suspicion that the Aptorum share purchase had been a fraudulent scheme from the beginning. she then demanded a certificate of incumbency for the grantor of the Put Option. Mr. Fok, however, did not respond to this e-mail.

65. After Ms. Cheung contacted Mr. Fok on June 10 and 11, 2020, demanding that he respond to her request for information concerning the grantor of the Put Option, Mr. Fok finally responded saying that he had forwarded Ms. Cheung's communications with him to "legal," and that he would respond the following week.

66. On or about June 16, 2020, in what was yet another transparent attempt at delay, Ms. Cheung received a letter from the Hong Kong law firm of So, Lung & Associates, attorneys

---

[3] *See* Aptorum Group Limited Class A Ordinary Shares (APM) Historical Data | Nasdaq; February 28, 2020 Press Release, available at Aptorum Group Announces Closing of $10 Million Registered Direct Offering of Class A Ordinary Shares and Warrants | Aptorum Group Limited.

for ACL, stating that the firm would respond to her request in two weeks. Ms. Cheung contacted Mr. Fok via WhatsApp to protest this unreasonable additional delay.

67. On or about June 19, 2020, Ms. Cheung received a second letter from So, Lung & Associates law firm stating, among other things, that ACL refused to provide information to her concerning the Put Notice grantor and suggesting that Ms. Cheung contact the grantor directly, in a further attempt to delay her exercise of her Put Option. Ms. Cheung's subsequent investigation shows that the "grantor" is most likely a phantom ghost.

**Ms. Cheung Discovered That Her Account Was Fraudulently Opened By the Enterprise**

68. The June 19, 2020 letter from So, Lung & Associates referred to Ms. Cheung's account at FSI(HK) as her "personal" account. This was the first time that Ms. Cheung became aware that a direct, personal account had been opened in her name, instead of a custodial account at FSI(HK) under ACL's name which was what Ms. Cheung agreed to.

69. To investigate this disturbing piece of information, on or about June 22, 2020 (while the world was grappling with the Covid-19 pandemic), Ms. Cheung visited one of FSI(HK)'s branch offices, where an FSI(HK) representative provided her with copies of the transaction records and an "Account Opening Form" for the FSI(HK) Account. To Ms. Cheung's shock and dismay, she discovered on the Account Opening Form a contact telephone number (64656583) and an e-mail address (karencheung000@yahoo.com) that did not belong to Ms. Cheung. Moreover, the signature on the form had been forged. Ms. Cheng did not sign that accounting opening form.

70. The Account Opening Form also contained a witness signature section, which stated that it was to be completed and signed only by a member of FSI(HK)'s staff. The signature of the witness on the Account Opening Form confirmed that the FSI(HK) staff member witnessed

the prospective customer's signature and verified the customer's identity. The Account Opening Form indicated that the witness was Mr. Fok, indicating that Mr. Fok was a member of FSI(HK)'s staff. Because Ms. Cheung never signed the form, Mr. Fok's signature on the form as a purported witness, done at the behest of the Enterprise, was fraudulent.

71. Ms. Cheung thereafter retained a handwriting expert, Emily Hui, who was professionally trained in the United Kingdom, to analyze Ms. Cheung's signature on the Account Opening Form. Ms. Hui has determined that there was a "strong probability" that the purported signature on the form was not Ms. Cheung's signature. Ms. Hui came to this conclusion after comparing 30 confirmed signatures of Ms. Cheung and following the professional standards in force in the United States for handwriting experts to determine the authenticity of a signature.

72. On or about June 23, 2020, Ms. Cheung reported the matter to the police in Hong Kong as she was clearly a victim of identity theft.

73. To further investigate the matter, Ms. Cheung met with a Compliance Officer at FSI(HK)'s main Hong Kong office on or about August 13, 2020. The Compliance Officer informed Ms. Cheung that, as part of FSI(HK)'s Know Your Customer ("KYC") procedure, FSI(HK) had contacted the purported holder of her account via telephone on several occasions in April and May 2019 verify her identity and that the conversations were recorded.

74. On or about August 13, 2020, Ms. Cheung listened to three of those recordings. Ms. Cheung determined that the woman on the recordings purporting to be her was not, in fact, her. Ms. Cheung immediately informed the Compliance Officer of this deception. Moreover, the Compliance Officer confirmed to Ms. Cheung that Mr. Fok had never been a member of FSI(HK)'s staff, further underscoring the blatant nature of Mr. Fok's fraud, perpetrated at the behest of the Enterprise.

75. In connection with litigation Ms. Cheung commenced in Hong Kong concerning this matter, FSI(HK) produced to her additional recordings of conversations between FSI(HK) and the same woman pretending to be her.

76. English-language transcripts of the recorded conversations between FSI(HK) and the woman pretending to be Ms. Cheung, which were in Cantonese, are annexed hereto as Exhibit 1.[4]

77. The Hong Kong Police Department has determined that the phone number falsely attributed to Ms. Cheung in the Account Opening Form was registered to Defendant Ling. The Hong Kong has arrested Mr. Ling in connection with this criminal misconduct. A copy of the email from the Hong Kong law enforcement authorities to Ms. Cheung is annexed hereto as Exhibit 2.

78. According to information posted on LinkedIn (annexed hereto as Exhibit 3), Mr. Ling has been employed by ACL in Hong Kong since December 2018. This provides yet more compelling proof that the Enterprise, led by Defendant Huen, directed the scheme to steal Ms. Cheung' identity to advance the fraudulent scheme described herein.

79. As a direct and proximate result of the foregoing fraud, Ms. Cheung has suffered damages in the amount of at least $740,493.35, from the fraudulent share purchases.

## FIRST CAUSE OF ACTION
## (Violations of RICO 18 U.S.C. § 1962(c))

80. Ms. Cheung repeats, realleges, and restates all preceding paragraphs as if fully set forth herein.

[4] Undersigned counsel understands that transcripts were professionally prepared in Hong Kong. In the transcripts, Ms. Cheung is referred to by the transliteration of her Cantonese name, Cheung Wing Tsz. In the transcripts, "Respondent" refers to FSI(HK).

81. Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3). At all times relevant, Defendants conducted the affairs of an association-in-fact enterprise, as that term is used in 18 U.S.C. § 1961(4), compromised of themselves and additional entities and individuals known and unknown through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

82. As described above, from a date unknown, but no later than in or around 2017 and continuing through the date of this Complaint, the members of the Enterprise worked together to further their mutual goals of illicitly purchasing shares of Aptorum shares without the consent or knowledge of the owner of the source of the funds.

83. As described above, each of the Defendants participated in the creation, operation, or management of the Enterprise, and each received income or other benefits and enriched themselves directly and indirectly from such efforts.

84. As described above, the Enterprise operates within the State of New York and elsewhere, including overseas.

85. As described above, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

86. As described above, the Enterprise had an ongoing organizational framework for carrying out its objectives. The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of illicitly purchasing shares of Aptorum shares without the consent or knowledge of the owner of the source of the funds.

87. As described above, Defendants and several of their associates share long-standing personal, professional, and financial ties, and these pre-existing affiliations and common ties facilitated the ability of Defendants to combine, merge, and conspire with themselves and others

to form their racketeering enterprise with the common purpose of illicitly purchasing shares of Aptorum shares without the consent or knowledge of the owner of the source of the funds.

88. By and through each of the Defendants' business, personal, and financial relationships with one another and their coordination with one another in the affairs of the Enterprise, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.

89. As described above, each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to of illicitly purchasing shares of Aptorum shares without the consent or knowledge of the owner of the source of the funds (Ms. Cheung), in violation of 18 U.S.C. § 1962(c).

90. As described above and can be inferred, Defendant Huen is the mastermind of the Enterprise. Mr. Lui, Mr. Fok and Mr. Ling are his capable and trusted lieutenants, with critical assistance from Ms. Lui In his capacity as the mastermind of the Enterprise, Hung has final authority on all significant business decisions of the Enterprise, and together with members of the Enterprise, are responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purposes. Together with Mr. Lui and Mr. Fok, Defendant Hung are responsible for the day-to-day operations of the Enterprise.

91. As described above, Mr. Lui, Mr. Fok, Mr. Ling and Ms. Lui have been active participants and central persons in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's scheme to illicitly purchase shares of Aptorum shares without the consent or knowledge of the owner of the source of the funds (Ms. Cheung).

92. As described above, each Defendant conducted and/or participated in the affairs of the Enterprise through a pattern of racketeering activity, including crimes indictable under Title 18, United States Code, Sections 1028 (relating to fraud and related activity in connection with identification documents), 1341 (relating mail fraud), 1343 (relating to wire fraud), and 1956 (relating to the laundering of monetary instruments).

93. As described above, each Defendant received income and other benefits and enriched themselves directly and indirectly from the pattern of racketeering alleged herein.

94. As described above, Plaintiff has been and continue to be injured in her business and property by Defendants' violations of 18 U.S.C. § 1962(c).

## SECOND CAUSE OF ACTION
## (Conspiracy to Violate RICO 18 U.S.C. § 1962(d))

95. Ms. Cheung repeats, realleges, and restates all preceding paragraphs as if fully set forth herein.

96. As described above, from a date unknown (but no later than 2017), and continuing through the date of this Complaint, within New York County and elsewhere, Defendants, together with other members of the Enterprise, knowingly and intentionally conspired and agreed with each other to cause the purchase of Aptorum shares through forgery, identity theft, wire fraud, mail fraud and money laundering. The manner and means of the aforementioned conspiracy include the preceding allegations, which are realleged and incorporated by referenced as though set forth fully herein.

97. As described above, Defendants and others conspired to cause the "purchase" of Aptorum shares in Ms. Cheung's name without her permission and consent. They then conspired together to conceal their unlawful conduct from her for as long as possible.

98. As described above, by and through each of the Defendant's business, personal, and financial relationships with one another and their coordination with one another in the affairs the Enterprise, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in the conspiracies described herein.

99. As described above, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, defraud, and harm Ms. Cheung economically and otherwise. The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

100. As described above, Defendants, together with others, conspired with each other to violate 18 U.S.C. § 1962(c). Defendants knowingly agreed, combined, and conspired to conduct or participate in the affairs of the association-in-fact Enterprise and each defendant agreed that the operation would involve repeated violations of crimes indictable under Title 18, United States Code, Sections 1028 (relating to fraud and related activity in connection with identification documents), 1341 (relating mail fraud), 1343 (relating to wire fraud), and 1956 (relating to the laundering of monetary instruments).

101. As described above, Defendants, together with others, conspired with each other to violate 18 U.S.C. § 1962(a). Defendants knowingly agreed, combined, and conspired to use or invest the proceeds of racketeering activity, to wit, income derived from crimes indictable under federal criminal law in the operation of a RICO enterprise, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce.

**THIRD CAUSE OF ACTION**
**(Fraud)**

102. Ms. Cheung repeats, realleges, and restates all preceding paragraphs as if fully set forth herein.

103. Members of the Enterprise and others, including Defendants herein, knowingly and willfully caused to be made materially untrue statements to Ms. Cheung in order to cause unauthorized purchase in Ms. Cheung's name shares of Aptorum using Ms. Cheung's funds.

104. Members of the Enterprise and others, including Defendants herein, knowingly and willfully made and/or caused to be made materially untrue statements to Ms. Cheung in order to cause her to hold onto the shares of Aptorum and not to sell them into the public markets.

105. One purpose of this fraudulent scheme was to use the unauthorized purchase of shares in Plaintiff's account to create the mirage that Defendant Aptorum was a viable company so that the Enterprise could earn extravagant ill-gotten director's fees and consulting fees for the benefit of its members..

106. Members of the Enterprise made and/or caused to be made these misrepresentations knowingly, willfully, with the intent to defraud Plaintiff and with the intent that Plaintiff would rely on these misrepresentations.

107. Plaintiff's reliance on these misrepresentations was reasonable and justified.

108. As a direct and proximate result of the foregoing fraud, Plaintiff has suffered damages in an amount to be determined at trial, but no less than approximately $740,493.35.

109. As a result of Defendants' fraudulent scheme and wrongful conduct, which was intentional, extreme and outrageous in nature, and in such conscious disregard of Plaintiff's rights as to be deemed willful and wanton, Plaintiff seeks punitive damages in the maximum amount permitted by law.

**FOURTH CAUSE OF ACTION**
**(Aiding and Abetting Breach of Fiduciary Duty)**

110. Ms. Cheung repeats, realleges, and restates all preceding paragraphs as if fully set forth herein.

111. A fiduciary relationship existed between Plaintiff, on the one hand, and Mr. Fok and Aeneas Capital, on the other hand, in that Mr. Fok and Aeneas Capital were in a position of trust with respect to Plaintiff's account at Aeneas Capital. Mr. Fok and Aeneas Capital had a duty to acted in the best interests of Plaintiff at all times.

112. Defendants herein knowingly and willfully substantially assisted and encouraged Mr. Fok and Aeneas Capital in engaging in willful misconduct, including committing fraud against Plaintiff, the unauthorized purchase of Aptorum shares in Plaintiff's account at Aeneas Capital, and an attempt to cause Plaintiff to lock up her Aptorum shares as opposed to mitigate her losses, all in violation of the duty to exercise due care that was required of Mr. Fok and Aeneas Capital.

113. As a direct and proximate result of Defendants' aiding and abetting multiple breaches of fiduciary duty by Mr. Fok and Aeneas Capital, Plaintiff has suffered, and continues to suffer, damages arising from the unauthorized purchase of Aptorum shares, and their efforts to induce Plaintiff to lock up her Aptorum shares as opposed to mitigate her losses.

114. The amount of damages is to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(Unjust Enrichment)**

115. Ms. Cheung repeats, realleges, and restates all preceding paragraphs as if fully set forth herein..

116. By their wrongful conduct, Defendants have been unjustly enriched at Plaintiff's expense.

117. It is against equity and good conscience to permit Defendants to retain the benefits derived from their wrongful conduct.

118. As a direct and proximate result of Defendants' conduct, which has been wanton and willful and in utter bad faith, Plaintiff has suffered and continues to suffer substantial damage and injury in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**(Civil Conspiracy)**

119. Ms. Cheung repeats, realleges, and restates all preceding paragraphs as if fully set forth herein.

120. Defendants (along with other members of the Enterprise) agreed with Mr. Fok and Aeneas Capital that they would in engage in willful misconduct, including committing fraud against Plaintiff, the unauthorized purchase of Aptorum shares in Plaintiff's account at Aeneas Capital, and an attempt to cause Plaintiff to lock up her Aptorum shares as opposed to mitigate her losses, all in violation of the duty to exercise due care that was required of Mr. Fok and Aeneas Capital, and all in an intentional effort to defraud Plaintiff.

121. One or more of the co-conspirators, including without limitation Defendants Aptorum and/or Huen, took steps to substantially assist and/or encourage Mr. Fok and Aeneas Capital in engaging in willful misconduct, including committing fraud against Plaintiff, the unauthorized purchase of Aptorum shares in Plaintiff's account at Aeneas Capital, and an attempt to cause Plaintiff to lock up her Aptorum shares as opposed to mitigate her losses, all in violation of the duty to exercise due care that was required of Mr. Fok and Aeneas Capital.

122. As a direct and proximate result of Defendants' conduct, which has been wanton and willful and in utter bad faith, Plaintiff has suffered and continues to suffer substantial damage and injury in an amount to be determined at trial.

## JURY TRIAL DEMAND

123. Ms. Cheung demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Ms. Cheung prays for judgment against Defendants on all claims, and request judgment providing the following relief:

i. Judgment in her favor and against Defendants on all causes of actions;

ii. For compensatory damages in an amount to be proven at trial;

iii. For punitive damages and exemplary damages according to proof at trial;

iv. For treble damages pursuant to 18 U.S.C. § 1964(c) and 18 U.S.C. § 1964(d);

v. For an injunction directing Nations Investments to dismiss the Singaporean action;

vi. For an order, pursuant to 18 U.S.C. § 1964(a), directing Defendants to divest themselves of any interest, direct or indirect, in the RICO Enterprise and its profits;

vii. For an order, pursuant to 18 U.S.C. § 1964(a), prohibiting Defendants from engaging with one another in the same type of endeavor as the Enterprise engaged in previously or is currently engaged in;

viii. For costs of suit incurred herein;

ix. For prejudgment interest;

x. For attorneys' fees and costs, including as warranted by applicable laws; and

xi. For such other and further relief as the Court may deem to be just and proper.

Dated: May 30, 2025
New York, New York

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: /s/ *Minyao Wang* ______________________
Minyao Wang, Esq.
77 Water Street, Suite 2100
New York, New York 10005
Telephone: (212) 232-1300
Email: Minyao.Wang@lewisbrisbois.com

*Attorneys for Plaintiff Karen Cheung*

# Exhibit 1

# Typed out transcripts of the Recordings

**i. A voicemail left by a staff member of the Respondent on 29 April 2019 at 15:02 hours**

You have reached the voicemail box of 64656583, please record your message after the tone and then hang up…

Staff: Hi, Ms. Cheung Wing Tsz, I am calling from Futu Securities International (Hong Kong) Limited. My surname is Chan, 8385945. We saw that you have opened an account and deposited a cheque in the sum of 8 million. Actually, we want to conduct an asset update (資產更新) with you. After the said asset update, my colleague can transfer the 8 million into your account, because when you opened the account, you informed us that your asset is at most 2.5 million and therefore we need to conduct an asset update. Please call our customer service hotline 25233588 when you are free, my colleague will inform me when you are free and I will call you to conduct the asset update. The money will be transferred into your account only after the said asset update. Thank you and bye-bye.

**ii. A call by a staff member of the Respondent diverted to voicemail of 6465 6583 on 29 April 2019 at 15:40 hours**

You have reached the voicemail box of 64656…

**iii. A voicemail left by a staff member of the Respondent on 30 April 2019 at 10:22 hours**

You have reached the voicemail box of 64656583, please record your message after the tone and then hang up…

Staff: Hi, Ms. Cheung Wing Tsz, I am calling from Futu Securities International (Hong Kong) Limited. My surname is Chan, number 5945. I would like to conduct an asset update with you as soon as possible so that money can be transferred into your account. Please call 25233588 when you are free, my colleague will let me know then I will call you to conduct the asset update. We have informed you of the details of the asset update in the last voice message, please call us when you are free. Thank you and bye-bye.

**iv. A voicemail left by a staff member of the Respondent on 2 May 2019 at 13:54 hours**

You have reached the voicemail box of 64656583, please record your message after the tone and then hang up…

Staff: Hi, Ms. Cheung Wing Tsz, I am calling from Futu Securities International (Hong Kong) Limited. I would like to conduct an asset update with you, we have called you before, as the amount is relatively large. Please call us as soon as possible after hearing this message so that we can conduct the asset update and transfer the money into your account. Bye.

v. **<u>A voicemail left by a staff member of the Respondent on 3 May 2019 at 10:00 hours</u>**

You have reached the voicemail box of 64656583, please record your message after the tone and then hang up…

Staff: Hi, Ms. Cheung Wing Tsz, I am calling from Futu Securities International (Hong Kong) Limited. I have already left two voice messages to you to urge you on the money, should be three voice messages to you. We need to conduct an asset update with you before the transfer of money into your account. When you have listened to this message, please call us as soon as possible to conduct the asset update, so that the money can be transferred into your account quickly as the amount is relatively large. Thank you and bye-bye.

vi. **<u>A call by a staff member of the Respondent diverted to voicemail of 6465 6583 on 3 May 2019 at 15:44 hours</u>**

Staff: Not listening to the call again.

You have reached the voicemail box of 646565…

vii. **<u>A telephone conversation on 3 May 2019 at 16:17 hours</u>**

Staff: Hi, this is Futu Securities International (Hong Kong) Limited, how can I help you?
Woman: Hi, I have just received your company's SMS asking me to conduct an asset update.
Staff: Asset update?
Woman: Yes, asset update.
Staff: Erm…can you give me your account number, I can help you to check.
Woman: Maybe I give you my HKID card number.
Staff: Sorry, we cannot check with your HKID or you give me the account number or telephone number?
Woman: Okay, you can try the telephone number 96871057.
Staff: 96871057?
Woman: Yes.

Staff: No opening of an account with this telephone number.
Woman: Aiya…not using this telephone number, maybe I will check the account number now and get back to you.
Staff: Okay, thank you.
Woman: Okay. Bye-bye.

**viii. <u>A telephone conversation on 3 May 2019 at 16:20 hours</u>**

Staff: Hi, this is Futu Securities International (Hong Kong) Limited, how can I help you?
Woman: Hi, I have just received your company's SMS asking me to conduct an asset update.
Staff: Please provide me with the telephone number for me to check.
Woman: Erm…96871057.
Staff: 9687…
Woman: Yes, 1057. How about I give you the account number?
Staff: Good.
Woman: 12181640.
Staff: Ms. Cheung?
Woman: Yes, that's me.
Staff: Wait, let me check. Hi, thank you for your patience waiting. Have you deposited a relatively large amount of money a few days ago?
Woman: Yes, 8 million.
Staff: When you will be free to listen to a call as this may require a special/another colleague to assist you?
Woman: What is this about? How long will it take?
Staff: Maybe a few minutes, because when you opened the account, your registered asset value was comparatively low which conflicts with the amount you deposited, therefore need to conduct a telephone recording with you.
Woman: Understood, I forgot which telephone number I have left with you.
Staff: Wait, I will help you check. Erm…6583.
Woman: Oh…6853 that one. Okay, maybe you call me around half hour …one hour… half hour later.
Staff: 5pm?
Woman: Ok.
Staff: 5pm, I will inform that colleague.
Woman: How should I call you?
Staff: My surname is Chan.
Woman: Mr. Chan. How about that colleague? I may have a meeting later, can I call back later if I need to change the time?
Staff: Yes, you can.
Woman: Call back to find you guys?
Staff: Yes.
Woman: Okay thank you.
Staff: Thank you.
Woman: Bye-bye.

ix. **A telephone conversation on 3 May 2019 at 16:26 hours**

Staff: Hi, this is Futu Securities International (Hong Kong) Limited, how can I help you?
Woman: Hi, my surname is Cheung. I have just called and made an appointment with your colleague to conduct an asset update later. I will leave Hong Kong in a minute, can I conduct the same online?
Staff: Cannot conduct online. What is your Futu's account number (牛牛號)?
Woman: What?
Staff: Futu's account number (牛牛號) and let me see if I can help you to conduct. Please wait.
Woman: 1218…
Staff: 1218…
Woman: 1640…
Staff: 1640… let me check first. Sorry, miss, maybe I will ask my colleague to reply to your call.
Woman: Erm…around how long?
Staff: Within 10 minutes. I will call her and ask her to get back to you as soon as possible.
Woman: If so, can you…I have left my phone number 6583…
Staff: Yes…6583…you want to change to another phone number?
Woman: Yes, as I have left my phone.
Staff: Okay, what number?
Woman: 91899373.
Staff: 9373…I will ask my colleague to call you.
Woman: Okay, thank you.
Staff: Welcome, thank you, and bye-bye.

**x. A telephone conversation on 3 May 2019 at 16:37 hours**

Woman: Wei?
Staff: Hi, I would like to find Ms. Cheung Wing Tsz.
Woman: Yes, I am.
Staff: This is a call from Futu Securities International (Hong Kong) Limited.
Woman: Yes.
Staff: Firstly, I want to ask a few questions. My surname is Chan, staff number 9545. My colleague informed me that you have changed to another telephone number, will you still be able to use the registered telephone number?
Woman: Yes, can still use…wait…wei?
Staff: Yes. No worries, want to check with you if we can still find you with the telephone number starting with the number 6?
Woman: Yes, you can find me but I have left my phone.
Staff: We saw the amount you have deposited was quite large, we started calling you since 29 and left many voice messages but you have not replied. But no worries…just want to contact you conveniently… do we need to update your telephone number to this number?
Woman: No need, I use that telephone number in Hong Kong, but I am departing from Hong Kong soon and that's why I use this number.

Staff: Okay no problem, let me cut a long story short and conduct the asset update with you, but it is already over 4:00 pm and passed our cut-off time, and our accountant has already settled the statement. We can only deposit the money into your account on Monday morning. You can pay attention to the Apps in relation to the money flow and I will conduct the asset update with you now.

Woman: Okay good.

Staff: Okay, I would like to talk with you about the total asset, previously you have filled in in the form that your annual income is 0.5-1 million and the total asset is around 0.5-2.5 million but now you have deposited 8 million which is over 2.5 million. Therefore, subject to compliance requirements, we need to conduct an asset update to change the asset amount to 5 million or above. This is the maximum point and therefore we will not call you again to conduct another asset update, there will be no problem if you deposit an amount larger than this. There are a few questions which we would like to ask you, firstly we would like to update about your occupation, are you currently employed?

Woman: No.

Staff: No. Previously you have filled in "housewife", is this still applicable?

Woman: Yes, correct.

Staff: Then I would like to ask about your annual income, not a must salary income can be rental income or housekeeping money, what is your annual income? The range?

Woman: The range? Can I pick?

Staff: No, to be provided by you. Approximate will be okay. You just need to give me the approximate amount.

Woman: Over 5 million.

Staff: Good. As mentioned just now, we will pick over 5 million for the total asset amount. How about your source of income, for example, saving, rental or investment…

Woman: Mainly rental income, shares and money from husband…

Staff: Rental income, housekeeping money and investment?

Woman: Correct.

Staff: How about your investment knowledge, proficient, good, relatively good, limited, or none?

Woman: Proficient.

Staff: Good, then how about your investment objective, capital gain and growth, speculation, or hedging?

Woman: Speculation.

Staff: Okay wait…speculation. Then how about the frequency of your monthly transactions, 0-5 times, 5-20 times or over 20 times? Average per month.

Woman: Average…more than 20 times.

Staff: Okay, then how about your risk tolerance, high, middle or low?

Woman: High.

Staff: Okay, the last few questions on your investment experience. How many years of investment experience do you have in purchasing shares?

Woman: More than 10 years.

Staff: How about structured products?

Woman: 5 years or above.

Staff: How about foreign currency or gold?

Woman: 5 years.
Staff: How about warrants or shares options?
Woman: Around 8 years.
Staff: Okay, last question, how about futures and options?
Woman: Same, over 8 years.
Staff: Good, we have finished with the asset update. You can pay attention to the money flow on Monday and the money will be transferred to your account as soon as possible.
Woman: Okay, no problem.
Staff: Thank you and bye-bye.

# Exhibit 2

**Wang, Minyao**

[redacted] [redacted]

[redacted]

[redacted]

---------- Forwarded message ---------
From: <jktangyh@police.gov.hk>
Date: Wed, 14 May 2025 at 15:25
Subject: Regarding your case "CRN 20022723"
To: Karen Cheung <[redacted]@gmail.com>

Dear Ms. Karen Cheung,

Please be informed that upon Police investigation into your case (Use of a false instrument, CRN 20022723), the phone number (64656583) involved is registered by LING Maximilian Shui Hung.

Furthermore, please be informed that Police have previously arrested LING Maximilian Shui Hung and the case is still under investigation.

Best Regards,

TANG Yu-hin, JK
OC DIT 3 CDIST
Tel : 3660 9573
Fax : 2549 2115

*** This e-mail message (together with any attachments) is for the designated recipient only. It may contain information that is privileged. If you are not the intended recipient, you are hereby notified that any use, retention, disclosure, copying, printing, forwarding or dissemination of the message is strictly prohibited. If you have received the message in error, please erase all copies of the message (including attachments) from your system and notify the sender immediately. ***

*** 此電郵訊息(連同任何附件)只發送給指定收件人。訊息可能包含享有特權資料。謹此通知，如你並非預定收件人，嚴禁使用、保留、披露、複製、列印、轉發或發布此訊息。如收到誤發的訊息，請把訊息的所有副本(包括附件)從系統內清除，並立即通知發件人。***

# Exhibit 3

Home My Network Jobs Messaging Notifications Me For Business Lear



# Maximilian Ling · 3rd

-

- Aeneas Group Limited
- Imperial College London

Hong Kong SAR · Contact info

71 connections

Message + Follow More

Connect if you know each other Connect

## Activity

73 followers

**Maximilian hasn't posted yet**

Recent posts Maximilian shares will be displayed here.

Show all activity →

## Experience

**Investment Manager**
Aeneas Group Limited · Full-time
Dec 2018 - Present · 6 yrs 6 mos
Sheung Wan, Hong Kong

**Investment Manager**
Varengold Capital
Oct 2015 - Dec 2018 · 3 yrs 3 mos

**Credit Analyst**
DBS Bank
Jan 2014 - Sep 2015 · 1 yr 9 mos

**Dealer**
Bank of China (Hong Kong)
Aug 2011 - Dec 2013 · 2 yrs 5 mos

## Education

Imperial College London
Master's Degree, Chemical Engineering
2007 - 2011

## Skills

Corporate Finance

Microsoft Office

Show all 5 skills →

## Interests

Companies Schools

Imperial College London
486,082 followers
+ Follow

Bank of China
180,249 followers
+ Follow

Show all companies →

Promoted •••

Minyao, explore relevant opportunities with MedPro Group
Get the latest jobs and industry news
Follow

## More profiles for you


zhiyuan Gan · 3rd
Assistant Finance Manager
Message

Ng Porter · 3rd
Vice President at WRISE Financial Services Limited
Message

Watt Kar Ho, CPA · 3rd
Eddid Financial Holdings Ltd - AVP - Finance & accounting
Message

Joseph Yau · 3rd
Trade Support
Message